The 4th District Appellate Court of the State of Illinois has reconvened. The Honorable Thomas M. Harris presiding. Good morning, counsel. We're on the record in consolidated cases 4-23-0358 and 4-23-0359. N. Ray, the estate of Milo Mundorff, Jr. Counsel, could you state your appearances first for the appellant? Thomas J. Potter, on behalf of Richard Mundorff. Okay, thank you. And for the appellee? Louis F. Pignatelli, attorney for the appellee. Mr. Potter, you may proceed. Thank you, Your Honors. May I please report, counsel? I've been having some speech issues, so I'll try to keep my voice up. These are consolidated cases, of course, and the first one, the CH case, was an accounting, for a suit for an accounting brought before Milo Mundorff passed away. After he passed away, an estate was opened. There was a will, but the will was not offered or admitted, so it was an estate with an administrator appointed. In that estate, Richard filed a citation proceeding seeking the same relief. So these are, with the exception of the treatment of the Dead Man's Act, these are virtually identical cases. The Dead Man's Act in the citation proceeding is not as rigid because all the witnesses are court's witnesses, which I learned from this case. But other than that, the cases are pretty much identical. Chris Campbell, the nephew of Milo, was undertaken, had undertaken to take care of Milo's affairs pursuant to a power of attorney executed several years ago, and under that power of attorney, he was, it was a normal Illinois form, and it did not provide for any gifts. However, Chris said that Milo had told him that after Milo's bills were paid at the veteran's home, that Chris should use the rest of the money, and this is essentially his defense. During this, there were three bank accounts that were in question, checking in the savings at Midland and a savings at Sterling Federal. The large one at Midland, respondent provided a bill of particulars, essentially, and commended the council for that because it took a lot of work. It showed that Chris had spent $98,000 of Milo's money. We had asked for a bill of particulars for the other account at Midland. That was resistant, and the court denied that request as premature. I don't know why it would be premature, but that's what the court said. So we went to trial with one, essentially, bill of particulars for one account, nothing for the rest of the accounts, and Chris was the only witness at trial. So we believe that the court misapplied, and the court placed some weight on the documents that Chris had Milo signed at the veteran's home, saying that yes, Chris could have this money. We believe the court misapplied. Mr. Potter, didn't the court say that it reached its conclusion, could reach the same conclusion, without considering that document? Yes, however, the document, well, it's hard when you have a standing objection to the Dead Man's Act, it's hard to know if the court considered it or didn't consider it. I'm hoping the court did not consider that document. I think the court did, but okay, we can talk about without the party witnesses. Chris's essential testimony was, Grandpa said I could. Well, that's far better than the Dead Man's Act. He says he never used the power of attorney. Well, that doesn't matter, because the power of attorney imposes fiduciary duties upon the agent from the time it is signed, regardless of when it starts to be used. And last, well, that's it. So there was no corroboration at all of Chris's testimony. Because of what I consider the low quality of all of Chris's testimony, it certainly does not meet the standard of clear and convincing evidence. Can I ask you, Mr. Potter, the account out of which the funds were taken by Christopher was a joint account, is that correct? Correct. And you haven't challenged the creation of the account, is that also correct? Well, I challenge, a fiduciary, it doesn't matter what vehicle the fiduciary uses to take the money. If they want to have a joint account for the convenience of the fiduciary in handling the funds, that happens all the time. That doesn't make it to the fiduciary. I understand. I'm just saying you haven't questioned the validity of the joint account. The validity, well, per se, no. But if you open a joint account with $100, and then thousands and thousands of dollars run through that, and you take a slice of it every month. Right, but you're still talking about the withdrawals. I'm just talking about the creation of the joint account. So next question, did, after Milo's wife died, did anybody but Christopher transact with that account? Milo didn't, in other words. I don't believe so, I think it's correct. So this is kind of a global question about the estate's damages here. If the transactions had never taken place, the ones that you challenge, the money would have remained in the account. And at Milo's death, Chris would have been the survivor and would have been entitled to all of what was in the account. So in that context, tell me how the estate's even been damaged. Well, number one, that's not what happened. Number two, I know, but you want, you're saying you're damaged because of the transactions. But if the transactions had never occurred, wouldn't the estate be in the same position? I don't believe so. When I said we didn't challenge the account, and then I started saying it doesn't matter what vehicle the fiduciary uses to take the money, he still has to account for the money. We don't challenge that the account was opened and it was a joint tenancy account. So insofar as that goes, we didn't challenge it. However, it doesn't matter that it's a joint account because the fiduciary in his position can't even ask for something like that. Understood. But if the account, if he had never taken the money out of the account, you don't dispute he would have been entitled as the survivor to receive the balance on Milo's death, do you? As far as the bank goes, yes. But as far as the estate goes, we would still challenge that because the account was opened. That was a hit to a fiduciary. That carries with the presumption of fraud. And nothing in the record has overcome that presumption. So I presume there's nothing more that Chris had or put in the record. So yes, in that situation, we would have challenged the creation of the account. Mr. Potter, under Justice Dougherty's hypothetical, though, there is no self-dealing by Chris. And by operation of Milo's death in the hypothetical, that's then when he would receive the funds. So how would that be considered a fraudulent? So the action of opening the account is the action of self-dealing. Yes. You raise that in your situation. And what actually happened is taking a slice of money every month. Do you attack that in your pleading? It wasn't important how the evidence came into the record because he took money out every month. So that wasn't really appropriate. It was a hypothetical. I interrupted you. I'm sorry. You may proceed. Have I answered your question? Okay. If I could just go back. The account was opened on November 2nd and the first POA was executed on November 2nd. The first POA was in the 90s, I believe. I might be wrong. No, I see your point. 1999. Yeah. And let me keep going here. It was Milo who appointed Ruth and Chris. So Ruth dies. So it's Chris. So he had this POA from 1999 that also didn't provide for gifts. So he had no business opening up a joint account with his right of survivorship being a fiduciary. And in my brief, I say cases that he can't even ask for. He can't even seek it. It's the Puzo, I believe, on page nine of my brief. 1989. Okay. So anyway, the burden of proof that Chris is faced with is pretty stiff because it's clear and convincing. And ordinarily clear and convincing takes something other than the agency. Grandpa told me this all day long. But in the case where the account was opened at the brokerage, I can't put my hands right on it, but the money was ordered to be discouraged and refunded to the estate because there was no third. In one account, there was third-party testimony that the lady didn't know what she was doing. In a brokerage account, there was no third-party testimony. And because of that, the account was refunded to the estate. And here we are with no third-party testimony about anything. And no document that says the gifts are allowed, no POA that says they're allowed. There's a document that's untitled, which is from his response to Exhibit 21, and it appears in my appendix, which is the untitled document that Milo executed at the veteran's home. And that is my appendix 21, his response to Exhibit 21. And all that is is an attempt to modify the power of attorney without the formalities of a power of attorney. So it's nullity. It is invalid. It's not notarized. We don't know if Milo got third-party advice. Chris drafts up a document, sends it down to LaSalle Pruitt, and Milo signs it, and now everything's okay. That's Chris's document. Again, he can't even seem to have favoritism from the principal as a fiduciary. So Chris, far from clear and convincing testimony, he provided nothing except his own self-serving testimony, which is to be highly suspect in cases like this. Isn't that an argument about what weight the trial court should have given Chris's testimony? And that's something normally we would defer to the trial court on. Well, I'm glad you brought that up because the trial court also said, and this is reviewable, and this is part three of my brief, that the trial court shifted the burden to Rick by saying, well, Rick didn't provide any evidence that Milo didn't want this. Well, that's not Rick's burden at all. I think your honors should look at the trial court's reasoning there and say, why is she expecting Rick to come up with his own evidence when it's not his burden? She's blaming Rick for the lack of coming forward, and he didn't have to do that at all. That's de novo. That's reviewable de novo. And I think... Can't the trial... I mean, you don't have to shift the burden in a normal case to the defendant to make note that the defendant didn't bring any evidence in. That's simply commenting on the state of the evidence, isn't it? I don't know how you can read it that way. If she knew that Rick didn't have a burden, the trial judge would have said, of course, Rick doesn't have a burden, but she didn't say anything like that. From my reading of the opinion, she blames him, and at least partially must base her decision on that because there's no evidence that Chris brought forward that would reach the standard of clear and convincing. So, I think this is all reviewable de novo as far as how the court weighed the evidence. When you factor in what I believe is the court's improper request or demand of Rick... Aren't the court's words that she found that Christopher had rebutted by clear and convincing evidence the presumption of undue influence and fraud? That does not indicate that she has shifted the burden to Richard. Well... That one sentence, I think, yes, but I believe that if you read... There's no reason to mention it if it didn't affect her thought process. In my estimation, I think she improperly shifted or demanded or expected something from Rick when he didn't. He couldn't just sit there and listen. So, okay. As far as the Dead Man's Act in the accounting case, it applies with full force. And the Miller case, which I cite, is pretty close to this one in that in the Miller case, there were four messages that the proponent couldn't authenticate because his testimony would be barred by the Dead Man's Act. Counsel, if I may interrupt just because of the time constraint, do you agree that the Dead Man's Act refers only to testimony regarding conversations and events and not to documents? And events. Well, you have to prove up the document somehow. So, with regards to the challenge that Christopher's testimony regarding the events relates to its signing and the recognition of Milo's signature, isn't that really a foundation issue and not about the contents of the document? It is a foundational issue, but... Related to foundation? No, there was an objection as to the Dead Man's Act. And in the Miller case, if you read it closely, the Miller case, that was the same objection, Dead Man's Act. And they said, the court said, the Dead Man's Act applies because the proponent could not lay a proper foundation for admitting. But to avoid forfeiture, would Richard not have had to made a specific objection at the trial court? The plaintiff or the proponent in the Miller case did not make that specific objection, that it was decided under the Dead Man's Act. Mr. Potter, identifying a signature is not about a prior statement, nor is it about a prior event, is it? Probably not, but we don't know what legal advice he got. We don't know if he got any third-party advice. So, all we have is Chris supplying a document which doesn't comply with the Power of Attorney Act for Milo's sign, saying, yes, Chris could have the money. And again, the fiduciary is not entitled to do that. The fiduciary is not entitled to even seek a benefit. And that's what happened. Mr. Potter, the red light just came on, that indicates that you're out of time, but you'll have time in rebuttal argument. Okay, thank you. Thank you. Mr. Pinatelli, your argument? Thank you. In addressing what was just discussed, I think it's important to realize that... There's some other audio bleeding into it. Okay. Chris didn't create this account that he subsequently used under the knowledge and command of Milo that he get what was left after his bills were paid. Milo's wife and he went to the bank, opened the account, and Chris wasn't there. He wasn't in the other room. He wasn't with them. They opened the account without his knowledge. He was then told to go to the bank because they needed his signature because it was a joint account. As the judge pointed out, the count is significant because it does have the right of survivorship, and it's the two of them. If he wanted the count not to belong to both of them, then he wouldn't have put the right of survivorship. Now, of course, from then on, the question becomes Chris's participation in the account. Now, what is clear and convincing evidence? Let me point out this too. That account was opened in 2005, and Milo's wife died in 2008. So, the account was opened for some time after she appeared with Milo and opened the account at the bank. Now, there has been a lot of testimony or argument by Mr. Potter that there should have been some kind of a citation issue. Well, if you look at the documents that were produced, all the documents were produced with regard to the accounts. As a matter of fact, not only were the documents produced, but Chris went back and submitted invoices where he could concerning the expenses that were paid. So, both counts, all three accounts had account records tendered. So, as far as asking for a citation and not being accorded one, there was one citation that was issued. Documents were produced. There wasn't another citation requested, but Chris, because Mr. Potter, on behalf of his clients, had requested additional account information, those accounts' information, the statements, the checks were submitted. Now, Mr. Potter argues that one of the accounts had information submitted that made it difficult to construct and understand the accounting. I think that's interesting because he doesn't say that with a little bit of work, it couldn't have been accommodated or understood, but just that he rejected because it looked like it's going to take too much work to understand what took place. Well, it was accorded, it was given to Mr. Potter. The Miller case, I found interesting because one of the observations, one of the rulings of the Miller case was the trial court, as the trier of fact, is obligated to weigh and evaluate the evidence. As an appellate court sitting in review, the reviewing court must defer to the findings of the trial court unless they are clearly against the manifest weight of the evidence. There has been no proof, I'm suggesting to you, that there's an argument that they've proven that the ruling was not against the manifest weight of the evidence. The- Mr. Penney, may I interrupt you for a moment and ask a question? It's just simply, after there has been evidence of self-dealing, then it raises the presumption of fraud, right? Right. And then that has to be rebutted by clear and convincing evidence, right? So the trial court, in its written decision, indicated, let me just find that portion. It says, the evidence showed that Milo, who was never found to be incompetent, authorized these transactions as payment for the many services that Chris provided to Milo over the years. Now, for purposes of my question, I'd like for you to put aside Respondents' Exhibit Number 21, which is the signed document by Milo. And can you just identify what evidence is in the signed document? Well, I think that we start out by looking at the way the account was opened. And that was, without Chris being there, he was given an undivided half interest in that joint and what went into it was going to be his as well as. Now, I understand that as a fiduciary, that there is a duty imposed upon him. But the question becomes, did he fulfill the duty? And has he shown? Now, there were several cases that were cited by Appellant. The Spring Valley Nursing case, the Puzo case and the Collins case. Well, that's true. They were all cited. And they all say essentially the same thing when they recite the standard. And the standard is, by clear and convincing evidence, the burden is on the agent to rebut the presumption that he acted in good faith. Well, for 17 years, for almost three decades or two decades, he did act in good faith, giving Milo what he needed to sustain because he couldn't do it himself. So, he was a constant support for Milo. And that he did not betray the confidence placed in him. Well, he did not betray the confidence placed in him. If the agent satisfies that burden, the transaction will be upheld. Now, the way Milo created the account, the way there was another joint account created and another account to handle Milo's business, as well as his personal matters of bringing him what he needed as far as household goods, being there to mow his lawn, being there when it was necessary to do a house repair, being there when it was necessary to get a rental house brought up to specs and sold, then dividing the proceeds, without a realtor, by the way, so there was more money to divide between the two, his son and his grandson. And the factors that each of those courts recited was, one, whether the fiduciary made a frank disclosure to the principal of the information he had. Well, the account was created. There were statements that were actually produced. And the fiduciary, the principal actually opened the account. So, he knew it was there. He knew he had Chris on the account. Secondly, whether the fiduciary paid adequate consideration. Well, there was an open call of whatever Milo needed. And that was not only at home, but when he went into the nursing home. Mr. Penatelli, let me interrupt you again, just for a moment, and maybe I'll approach it from a different point of view. Again, the trial court statement that the evidence showed that Milo authorized these transactions as payment for the many services that Chris provided to Milo over the years, that finding by the trial court, did it need to make that finding in order for Chris to prevail here? I'm not sure that, I don't think it needed to, because if we look at the standard that a petitioner or a person who's challenged to has received funds, it was clear when the account was created that Chris was going to be the beneficiary of the account. And did he fulfill the expectations that Milo had as the beneficiary of the account? Where he could at any time withdraw. But he withdrew to pay Milo's bills, to bank the money that Milo received, and he was competent, he was lucid, he knew what his fares were. It shows up until he, when he was in the nursing home, that's where the medical records were introduced. So he was cognizant of the fact that all the monies that he was entitled to on a and that those funds were used, and that Chris was making withdrawals, because that's the way it was set up. And then we find later in this statement that, by the way, the appellant, in answer to a request to admit that this was a document signed by Milo, admitted that this was a document signed by Milo, giving Chris the authority to do what he did, and reciting that it went back to the earlier time when the account was opened. Mr. Penatelli, let me interrupt you again. So anytime there's a property power of attorney that is in operation, or that's in effect, and the agent is operating under it, and actually providing services under it, there can be no self-dealing without this presumption of fraud coming into play, right? Yes. Okay. So every power of attorney, every occasion where an agent is doing, performing services for the principal under a power of attorney, this is what happens when agents are performing those duties, exercising the function of the agent under a power of attorney. This is what happens in these situations where you have an executed power of attorney, where the agent is performing functions as set forth in the power of attorney. But here you have a situation where the agent is also paying himself, or making payments from an account. There has to be an explanation provided for why the agent is paying himself. I mean, in order to meet the clear and convincing standard to rebut the presumption of fraud, there has to be some evidence presented as to why he is paying himself, what the authorization is under the power of attorney. Well, I think that you have circumstantial evidence in that this went on for the time it did, and it encompassed the savings, hourly income on a monthly basis, and then bills were paid. And I may have phrased it poorly, and I'm, actually, I know that I did. But here, there was evidence that Chris was performing all of these duties under the power of attorney, right? Yes. Okay. But that doesn't actually, it doesn't move the needle in terms of meeting his burden of rebutting the presumption of fraud. There has to be something beyond that. Because all he's doing is indicating that he was operating under the power of attorney performing these services. But there has to be additional evidence indicating that he was authorized to pay himself. Is that right? Well, I think part of the way the account was created and set up, the fact that over the years, there was a lot of rewarding Chris for the relationship that he had with his grandfather, because the account was opened with both of them having an undivided interest in the whole and Chris getting the whole account one graphic. So that would, I think, go to the intention of how grandpa felt towards his grandson, who was happy. I think that's circumstantial evidence that that relationship had been mandated, understanding that that's why he was getting funds for doing everything that grandpa needed. And the funds were over and above what grandpa needed. On the 2015 document, isn't that an out of court statement by Milo, offered for the truth of the matter stated in it? I'm sorry, I didn't get that question. Isn't the 2015 document signed by Milo, an out of court statement by Milo, offered for the truth of the matter asserted in that document? Yes, I think it is. So then it's hearsay? I think that objection wasn't made. And we have the fact that there was a request to admit that this was a document bearing Milo's signature. And that was not denied. So we have the admission of the document as being signed by Milo. Right. Well, foundation doesn't always cure a hearsay issue. But if you're saying it was not objected to on those grounds, are you sure of that? Well, he admitted that the document was valid and had more Milo's signature. Right. He could admit that it's an accurate copy of the newspaper, that wouldn't make it admissible in evidence. But the fact that it was signed by the person who we're talking about, who's the principal, and specifically describes what took place and how it's functioned over the years, I think that it's not a newspaper document. I think it's a document that establishes further evidence of how these two interacted with Chris fulfilling Milo's expectations and benefiting Milo. It's a written down out of court statement that we have no reason to question its foundation. But it's still an out of court statement. It is. And there was no objection to hearsay. I don't remember that being made. Unless we're... Because the admission I'm suggesting puts it into a different category than if it was other out of court document or statement that we had to do the foundation. Now, which gets back to why in the one case that was cited where there were recordings made, the bottom line is the court in that case said there was no objection to foundation, meaning that if there was an objection to the foundation, the document may not... Now, in this case, what the court is suggesting, if there had been an objection to foundation, that document may not have been admitted. But there was no objection. Counsel, just briefly and circling back a little bit to what Justice Harris was discussing, the mere fact that the agent does services for the principal under power of attorney doesn't necessarily entitled him to any type of compensation. So the question going back to this, was there anything in the record to suggest a history or pattern prior to the opening of the joint account or prior to Christopher being named at the durable power of attorney that he had been receiving compensation historically? No, there isn't. And it's an interesting question you ask because what did he have to do with the power of attorney? And the answer is two days after the account was already open, they asked him to come in and sign as a joint account holder because he was made a joint account holder. And then he checked off that there's not going to be withholding. That's the only time that the power of attorney was used by Chris. All the other times he could use his status as a joint account holder and make payments there from Formilo. I think your time may be up, Mr. Pinatelli, but didn't the Illinois Supreme Court state that the fiduciary duty exists upon signing of the POA unrelated to exercise of the authority under the POA? It certainly does, which is an interesting fact because in the real world, how many people are aware that that's the case? I understand what the law says, but he never had to use it once to present it to anyone for purposes of achieving the agreement between them or the donated intent of Milo towards his grandson. I'll ask the panel if there are any other questions for Mr. Pinatelli. All right, seeing none, thank you, Mr. Pinatelli. Mr. Potter, rebuttal argument? Thank you, Your Honor. I did object to what was just said. At the bottom of page 49, of the transcript, it would be R-50. I said I would object to the omission of Respondents Exhibit 21 based on the Dead Man's Act and the court said, can you hear him, Candy? Candy's your court reporter. She said, yes, the court, thank you. Then it reminds me on R-51 and I say, and well, it's also hearsay. So I did object to Respondents Exhibit 21 based on hearsay. Did the court make any ruling as to the hearsay portion of the objection? Mr. Pinatelli says, I don't believe it is. The court says, well, why don't we do this? Why don't we table the ruling on the objection and you can continue to inquire and lay an additional foundation that you would like to lay for Exhibit 21, also known as No. 5. But it does not reflect the court. Well, it kind of did, so she must have overruled the objection. Okay, thank you. In the state of Miller, it sounds to me toward the end like Mr. Pinatelli thought that the tapes were admitted because the foundation objection was not raised. Actually, the tapes were excluded and that was in the face of the foundational objection not raised. The tapes were excluded because the proponent could not lay a foundation because of the Dead Man Act. We don't need a foundation here, do we? Because you admitted the authenticity of the document. I admitted that Milo signed the document. That doesn't mean that all the niceties that should have surrounded the document, like independent legal advice, who was there, who were the witnesses. Well, I think you're talking about the sufficiency of the document, but for admission of the document, doesn't the foundational issue get cured by your admission of its authenticity? I admit it was authentic, but I still objected based on your objection. You understand the difference between its sufficiency versus admissibility? Yes, I do. Okay, but that doesn't disclose my initial objection. I think that your honor should reverse the trial court and send this back with instructions to compel the respondent to provide an accounting for the other case and then to enter the judgment against the respondent for the funds that he cannot properly account for by clearing convincing evidence. That's all I have. Thank you. All right. Thank you, Mr. Potter. Thank you both. The case will be taken under advisement and we will issue a written decision. The court stands in recess.